Andrew Rozynski, Esq. (NY #5054465)
EISENBERG & BAUM, LLP
24 Union Square East, PH
New York, NY 10003
212-353-8700 (tel.)
917-591-2875 (fax)
arozynski@eandblaw.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| HOWARD KNIGHT,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>TEXAS HOSPITAL HOLDINGS, LLC;<br>TEXAS WEST OAKS HOSPITAL, L.P.; and<br>WEST OAKS HOSPITAL, INC.;<br><br>　　　　Defendants. | **Civil Action No.: 21-3124**<br><br><br>**COMPLAINT** |

　　　　Plaintiff Howard Knight ("Plaintiff" or "Mr. Knight"), by and through his undersigned counsel, Eisenberg & Baum, LLP, states his Complaint against defendants Texas Hospital Holdings, LLC; Texas West Oaks Hospital, L.P.; and West Oaks Hospital, Inc. (collectively, "Defendants") as follows based upon personal knowledge and information and belief:

## INTRODUCTION

　　　　1.　　Plaintiff Howard Knight is a deaf individual whose primary and preferred means of communication is American Sign Language ("ASL"). He requires an ASL interpreter to effectively communicate.

2. From December 2 until December 20, 2019, Mr. Knight resided and received inpatient detox treatment at defendant West Oaks Hospital (the "Hospital").

3. Throughout his stay, West Oaks failed to provide Mr. Knight with ASL sign language interpreters for his treatment despite his repeated requests.

4. On many occasions, Mr. Knight did not receive an interpreter for substantial conversations and situations requiring interactive communication. On other occasions, to avoid receiving no information, counseling or treatment, Mr. Knight was forced to hire his own interpreter when West Oaks would not provide one for him.

5. Mr. Knight spent $3,447.50 to hire private ASL interpreters for his inpatient treatment and has not been reimbursed to date.

6. Defendants discriminated against Mr. Knight by refusing reasonable accommodations he required to understand and participate in his treatment, depriving him of equally effective communication and equal participation during his nineteen-day stay at West Oaks.

7. Mr. Knight endured protracted humiliation because of Defendants' failure to accommodate his deafness. Defendants' actions caused him greater levels of fear, anxiety, indignity, frustration, humiliation, and emotional distress than a hearing person would be expected to experience.

8. Based on Mr. Knight's experience, it is evident that Defendants have failed to implement proper policies, procedures, trainings, and practices respecting the civil rights and communication needs of deaf individuals. Mr. Knight brings this lawsuit to compel Defendants to cease their unlawful discriminatory practices, and implement policies and procedures that will ensure deaf individuals effective communication and full and equal enjoyment Defendants'

programs and services.

9. Plaintiff seeks injunctive and declaratory relief, nominal damages, all compensatory damages available under the relevant statutes, punitive damages, and attorneys' fees and costs to redress Defendants' unlawful disability discrimination in violation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116; the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, et. seq.; and the Texas Human Resources Code ("THRC"), Tex. Hum. Res. Code § 121.003(d) *et seq*.

## THE PARTIES

10. Plaintiff Howard Knight is a 50-year-old individual who resides in Houston, Texas. Mr. Knight is profoundly deaf and communicates primarily in American Sign Language. He is substantially limited in the major life activities of hearing and speaking, and is a qualified person with a disability within the meaning of federal and state civil rights statutes.

11. Defendant West Oaks Hospital, Inc. ("West Oaks") is a Delaware corporation and residential rehabilitation treatment center that has been licensed and doing business in Texas with a principal place of business at 6500 Hornwood Drive, Houston, Texas 77074 and a registered address for service at c/o the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Upon information and belief, West Oaks receives federal financial assistance, including Medicare and/or Medicaid reimbursements.

12. Defendant Texas Hospital Holdings, LLC ("THH") is a limited liability company organized and operating within the State of Texas with a designated address for service at c/o Corporation Service Company d/b/a CSC-Lawyers Inco, 211 E. 7th St. Suite 620, Austin, Texas 78701. Upon information and belief, THH is a parent company of defendant West Oaks and receives federal financial assistance, including Medicare and/or Medicaid reimbursements.

13. Defendant Texas West Oaks Hospital, L.P. ("TWOH") is a limited partnership organized and operating within the State of Texas with a designated address for service at c/o Corporation Service Company d/b/a CSC-Lawyers Inco, 211 E. 7th St. Suite 620, Austin, Texas 78701. Upon information and belief, TWOH is a parent company of defendant West Oaks and receives federal financial assistance, including Medicare and/or Medicaid reimbursements.

## JURISDICTION & VENUE

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claims arising under the laws of the United States, and has supplemental jurisdiction over Plaintiff's state and local law claims pursuant to 28 U.S.C. § 1367.

15. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the acts and omissions that give rise to the claims occurred within this District.

## CONDITION PRECEDENT FOR TEXAS HUMAN RESOURCES CODE CLAIM

16. Pursuant to Tex. Hum. Res. Code § 121.0041(c), a claimant must give written notice of its claims to defendants "[n]ot later than the 60th day before the date an action to which this section applies is filed."

17. On February 3 and 5, 2021, Plaintiff provided notice by letter to all Defendants in this action which included Plaintiff's name, a description of each alleged violation in reasonable detail, and the date, place, and manner in which Plaintiff discovered each alleged violation.

18. As such, Plaintiff has timely complied with the requirements of Tex. Hum. Res. Code § 121.0041(c) *et seq.* as a prerequisite to commencing this suit for violations of the THRC.

## STATEMENT OF FACTS

19. Plaintiff Howard Knight is a 50-year-old profoundly deaf individual who

4

communicates primarily in ASL. He requires an ASL interpreter to effectively communicate in a medical or healthcare setting.

20. West Oaks is an inpatient residential rehabilitation and treatment center that offers 16 available beds to the public.

21. Mr. Knight was admitted to West Oaks for inpatient alcohol detox treatment around 1:30 p.m. on December 2, 2019 and resided there until December 20, 2019.

22. The intake process lasted approximately three hours and involved Mr. Knight having to remove his clothes for inspection and having personal items such as his belt, watch, and phone taken from him, all without the presence of an ASL interpreter or other auxiliary aid.

23. Mr. Knight was then placed a room in West Oaks' detox unit for approximately 24 hours until he could be assessed by doctors the next day. At no point during this day and night was Mr. Knight provided with interpretive services or any other auxiliary aid.

24. Over the next three days, Mr. Knight had an interpreter for morning and afternoon group therapy sessions, but had no means to communicate with residents, staff and medical personnel for the remainder of each day.

25. On December 6, 2019, however, West Oaks staff informed Mr. Knight that he would be transferred to the Residential Therapy Center to continue receiving in-patient treatment, but that Mr. Knight would have to pay for his own interpretation services.

26. Mr. Knight was transferred to West Oaks' Residential Therapy Center on December 7, 2019. West Oaks refused to provide Mr. Knight with an interpreter for the remainder of his stay.

27. Beginning on December 8, 2019, Mr. Knight arranged for a private interpreter at his own expense, finally allowing him to communicate and participate during some of his treatment, including group meetings and therapy appointments, for the remainder of his stay.

28. Mr. Knight was forced to provide his own interpreter at his own expense for his unit transfer, AA meetings, group therapy meetings, and other mandatory events on the following dates and during the following times:

| DATE | TIME |
| --- | --- |
| December 8, 2019 | 10:00am - 11:40am |
| December 9, 2019 | 9:00am - 12:00pm |
| December 10, 2019 | 9:00am - 12:00pm |
| December 11, 2019 | 9:00am - 12:00pm |
| December 11, 2019 | 7:00pm - 9:00pm |
| December 12, 2019 | 9:00am - 12:00pm |
| December 12, 2019 | 8:00pm - 9:00pm |
| December 13, 2019 | 9:00am - 12:00pm |
| December 14, 2019 | 10:00am - 12:00pm |
| December 14, 2019 | 8:00pm - 9:00pm |
| December 15, 2019 | 10:15am - 11:15am |
| December 16, 2019 | 9:00am - 12:00pm |
| December 17, 2019 | 9:00am - 12:00pm |
| December 17, 2019 | 8:00pm - 9:00pm |
| December 18, 2019 | 9:00am - 12:00pm |
| December 18, 2019 | 7:00pm - 9:00pm |
| December 19, 2019 | 9:00am - 12:00pm |
| December 20, 2019 | 9:00am - 12:00pm |

29. Mr. Knight spent $3,447.50 to hire private interpreters for his treatment and has not been reimbursed by Defendants to date.

30. At all other times, Mr. Knight was forced to go without an interpreter due to the prohibitive cost of providing his own interpreter at crucial points during his treatment.

31. For example, on December 9, Mr. Knight's unit was scheduled to have an evening guest speaker related to West Oaks' AA services. Mr. Knight was unable to communicate or listen to with the speaker without an interpreter.

32. Later that evening, Mr. Knight attended an AA meeting without an interpreter present, and was completely unable to understand what was being said or participate in the meeting.

33. On December 10, Mr. Knight met with his doctor about Hospital staff's refusal to permit Mr. Knight to run laps in the courtyard outside West Oaks in place of the numerous outdoor smoke breaks allotted to other patients. Mr. Knight was unable to fully understand his doctor during this meeting because no interpreter was provided for him.

34. Later that evening, Mr. Knight again had to attend an AA meeting without an interpreter present, and was unable to understand what was being said or participate in the meeting.

35. Throughout his treatment, West Oaks staff treated Mr. Knight and his private interpreters with hostility. For example, on December 11, West Oaks staff disrupted Mr. Knight in the middle of a group therapy session and asked Mr. Knight's private interpreter Kristen to sign a confidentiality agreement. West Oaks informed Kristen that if she refused to sign the agreement, West Oaks would discharge Plaintiff, continue treatment without an interpreter, or continue treatment through use of an iPad and Google Translate software, which was unreliable at best and non-functional at worst. West Oak's threatening behavior caused Mr. Knight to feel humiliated and anxious that he would not be able to continue receiving treatment from West Oaks, and took him away from costly and precious time with his private interpreter and the group therapy session.

36. On December 11, Mr. Knight met with his therapist to express his frustration with the lack of an interpreter provided by West Oaks, the issues he was having with the iPad and Google Translate software, and the exorbitant cost of having to provide his own interpreter. Mr. Knight was unable to understand his therapist because there was no interpreter present.

37. In the evening of December 11, after Mr. Knight's usual hired interpreter Kristen was unavailable due to a family emergency, another interpreter from the company Mr. Knight hired arrived but West Oaks denied the interpreter access to his unit. As such, Mr. Knight was without an interpreter for at least an hour of his group AA meeting.

38. In the evening of December 13, Mr. Knight again sat through an AA meeting without an interpreter present, and was unable to understand what was being said or participate in the meeting.

39. On December 14, Mr. Knight was required to attend a candle-lit AA meeting, in which all lights were shut off and it was too dark inside to see the interpreter Mr. Knight hired. As such, Mr. Knight and his hired interpreter sat outside in the lobby during this afternoon meeting.

40. On December 15, Mr. Knight's therapist changed his arrival time on short notice. Mr. Knight's hired interpreter was unable to remain and, as such, he was unable to participate in his afternoon group therapy appointment.

41. Throughout his entire stay, Mr. Knight repeatedly requested that West Oaks provide an ASL interpreter during his treatment or reimburse him for the cost of providing his own interpreter.

42. Defendants only intermittently provided Mr. Knight with an interpreter from his intake on December 2, 2019 until his transfer from the West Oaks detox unit to the Residential Therapy Center on December 6, 2019.

43. From December 7, 2019 until his discharge on December 20, 2019, Defendants never provided Mr. Knight with any interpretive services, and refused to otherwise accommodate him.

44. Defendants' continued failure and refusal to provide effective communication to

Mr. Knight throughout his treatment have left him isolated and uninformed, causing him extreme confusion, stress, frustration, and psychological damage.

45. The facts show that it is the longstanding, widespread, deliberately indifferent custom, habit, practice and/or policy of Defendants to permit their agents and agencies to use disability as a motivating factor in decisions and other actions.

46. The facts show that Defendants have failed to supervise and to train their agents regarding the rights of patients to be free from such disability discrimination in the provision of their services.

47. Defendants knew or should have known of their obligations under relevant federal and state laws to provide reasonable accommodations to individuals with disabilities, including individuals who are deaf or hard of hearing, and to develop policies to promote compliance with these statutes.

48. Defendants knew or should have known of their obligations under relevant federal and state laws and to develop policies to promote compliance with these statutes.

49. Upon information and belief, Defendants and their employees follow the recommendations and regulations of the Joint Commission.

50. Upon information and belief, Defendants and their employees follow the recommendations for effective communication in the Joint Commission's Advancing Effective Communication, Cultural Competence, and Patient- and Family-Centered Care: A Roadmap for Hospitals, https://bit.ly/3usVEEh ("A Roadmap for Hospitals").

51. Consistent with the Joint Commission's guidance, Defendants have a responsibility to "develop a system to provide language services to address the communication needs of patients whose preferred language is not English, including patients who communicate through sign

9

language." A Roadmap for Hospitals at page 40, https://bit.ly/3usVEEh.

52. Defendants have a responsibility to identify a "patient's preferred language for discussing health care." A Roadmap for Hospitals at page 10, https://bit.ly/3usVEEh.

53. If necessary to determine a patient's preferred language, Defendants should "[a]rrange for language services to help identify the patient's preferred language," and once the preferred language is identified, Defendants should "[n]ote the patient's preferred language for health care discussions in the medical record and communicate this information to staff." A Roadmap for Hospitals at page 10, https://bit.ly/3usVEEh.

54. The Joint Commission requires hospitals like Defendants to "[p]rovide an interpreter for the patient's preferred language during informed consent discussions, even if the hospital provides translated materials, to facilitate patient communication." A Roadmap for Hospitals at page 20, https://bit.ly/3usVEEh.

55. As advised by the Joint Commission, Defendants are aware that "[e]xchanging written notes . . . will likely be effective communication for brief and relatively simple face-to-face conversations." A Roadmap for Hospitals at page 69, https://bit.ly/3usVEEh.

56. Similarly, Defendants are aware that "[w]ritten forms or information sheets may provide effective communication in situations with little call for interactive communication, such as providing billing and insurance information or filling out admission forms and medical history inquiries." A Roadmap for Hospitals at page 69, https://bit.ly/3usVEEh.

57. Defendants knew or should have known of their obligations as health care providers under state and federal antidiscrimination laws to develop policies to promote compliance with these statutes and to provide reasonable accommodations, including the provision of ASL interpreters to ensure effective communication with deaf individuals.

58. Defendants knew or should have known that their actions and/or inactions created an unreasonable risk of causing Mr. Knight greater levels of fear, anxiety, indignity, humiliation, and/or emotional distress than a hearing person would be expected to experience.

59. Defendants' failure to provide effective communication to Mr. Knight amounted to discriminatory treatment where he received services that were objectively substandard and inferior to those provided to persons who are hearing.

60. Defendants' wrongful and intentional disability discrimination against Mr. Knight is also reflected by the Defendants' failure to train employees and agents and promulgate policies of non-discrimination against deaf individuals.

61. Mr. Knight spent $3,447.50 to hire private interpreters for his treatment and has not been reimbursed by Defendants to date.

62. Mr. Knight, a resident of Texas, wishes and expects to have future encounters with Defendants, whether by choice or necessity. However, Mr. Knight is deterred from seeking the aid of Defendants due to Defendants' discrimination against him on the basis of his disability.

63. Defendants intentionally discriminated against Mr. Knight and acted with deliberate indifference to his communication needs, causing him to endure humiliation, shame, fear, anxiety, and emotional distress.

## **CAUSES OF ACTION**

**COUNT I: Violations of Section 1557 of the Patient Protection and Affordable Care Act**

64. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

65. At all times relevant to this action, the ACA has been in full force and effect and has applied to Defendants' conduct.

66. At all times relevant to this action, Plaintiff has had substantial limitations to the major life activities of hearing and speaking and has been an individual with a disability within the meaning of the ACA, 42 U.S.C. § 18116.

67. At all times relevant to this action, Defendants received federal financial assistance, including Medicare and Medicaid reimbursements, and have been principally engaged in the business of providing health care. Thus, Defendants are health programs or activities receiving federal financial assistance under 42 U.S.C. § 18116(a).

68. Under the ACA, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116.

69. Federal regulations implementing the ACA provide that a covered entity "shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in such programs or activities, in accordance with the standards found at 28 CFR 35.160 through 35.164." 45 C.F.R. § 92.102(a).

70. Accordingly, federal regulations implementing the ACA also provide that a "[covered] entity shall furnish appropriate auxiliary aids and services when necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a [covered] entity. . . . In determining what types of auxiliary aids and services are necessary, a [covered] entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the

individual with a disability. 28 C.F.R. § 35.160(b), *cited by* 45 C.F.R. § 92.102(a).

71. At all times relevant to this action, Plaintiff's primary language for communication has been ASL, and he has a limited ability to read, write, speak, or understand English. Plaintiff is thus also an individual with limited English proficiency within the meaning of the ACA.

72. Indeed, the ACA regulations governing individuals with disabilities and individuals with limited English proficiency contain virtually identical definitions, prohibitions, and requirements. For example, compare 45 C.F.R. § 92.102(b)(2)(i)–(iii) regarding the provision of interpreters to individuals with disabilities:

> When an entity is required to provide an interpreter . . . the interpreting service shall be provided to individuals free of charge and in a timely manner, via a remote interpreting service or an onsite appearance, by an interpreter who
>
> (i) Adheres to generally accepted interpreter ethics principles, including client confidentiality; and
>
> (ii) Is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary, terminology and phraseology;

with 45 C.F.R. § 92.101(b)(3)(i)(A)–(C) regarding the provision of interpreters with limited English proficiency:

> [Interpreter services] must be provided by an interpreter who:
>
> (A) Adheres to generally accepted interpreter ethics principles, including client confidentiality;
>
> (B) Has demonstrated proficiency in speaking and understanding at least spoken English and the spoken language in need of interpretation; and
>
> (C) Is able to interpret effectively, accurately, and impartially, both receptively and expressly, to and from such language(s) and English, using any necessary specialized vocabulary, terminology and phraseology.

13

73. During Plaintiff's visits to Defendants' facility in 2019, federal regulations implementing the ACA provided that (1) a "covered entity shall offer a qualified interpreter to an individual with limited English proficiency when oral interpretation is a reasonable step to provide meaningful access for that individual with limited English proficiency" and (2) a "covered entity shall use a qualified translator when translating written content in paper or electronic form." 45 C.F.R. § 92.201(d)(1)–(2).

74. Since August 2020, federal regulations implementing the ACA similarly provide that a covered entity "shall take reasonable steps to ensure meaningful access to such programs or activities by limited English proficient individuals," 45 C.F.R. § 92.101(a), and that where an individual "requires the provision of language assistance services, such services must be provided free of charge, be accurate and timely, and protect the privacy and independence of the individual with limited English proficiency. Language assistance services may include: (i) Oral language assistance, including interpretation in non-English languages provided in-person or remotely by a qualified interpreter for an individual with limited English proficiency, and the use of qualified bilingual or multilingual staff to communicate directly with individuals with limited English proficiency; and (ii) Written translation, performed by a qualified translator, of written content in paper or electronic form into languages other than English." 45 C.F.R. § 92.101(b)(2)(i)–( iv).

75. Federal regulations implementing the ACA further provide that "[n]othing in this section shall be construed to require an individual with limited English proficiency to accept [the] language assistance services" provided. 45 CFR § 92.101(c).

76. As set forth above, Defendants discriminated against Plaintiff on the basis of his disability in violation of the ACA and its implementing regulations.

77. The ACA, by incorporating the enforcement mechanism of the RA, extends a cause

of action to Plaintiff – that is, "any person aggrieved" by discrimination in violation of the Rehabilitation Act. 42 U.S.C. § 18116(a).

78. Defendants have failed to implement policies, procedures, and training of Hospital staff necessary to ensure compliance with the ACA.

79. Plaintiff is therefore entitled to injunctive relief, all compensatory damages available, and attorneys' fees, costs, and disbursements for the injuries and loss he sustained as a result of Defendants' discriminatory conduct and deliberate indifference as alleged under 42 U.S.C. § 18116(a).

### COUNT II: Violations of the Fair Housing Act

80. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

81. This action is brought to enforce the requirements of the FHA, 42 U.S.C. § 3604, et. seq.

82. Defendants own and lease dwellings within the meaning of U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

83. The FHA applies to all dwellings "*except as exempted by sections 803(b) [§ 3603(b)] and 807 [§ 3607] of this title*." 42 U.S.C. § 3604 (emphasis added); *see also* 42 U.S.C. § 3603(a) (stating that upon enactment, the FHA's prohibition of discrimination in the sale or rental of dwellings would immediately cover four types of dwellings, and after December 31, 1968, such coverage would extend to "all other dwellings except as exempted by [Section 3603(b)]").

84. Drug and substance abuse rehabilitation facilities are not exempted by any provision of the FHA, and are therefore covered under the FHA. *See, e.g., Harmony Haus*

15

*Westlake, LLC v. Parkstone Prop. Owners Ass'n*, 440 F. Supp. 3d 654, 662 (W.D. Tex. 2020) (transitional sober living facility is a dwelling under the FHA); *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1213-16 (11th Cir. 2008) (recovery homes are "dwellings" under the FHA despite their transient residents); *United States v. S. Mgmt. Corp.*, 955 F.2d 914, 923 (4th Cir. 1992) (FHA applies to drug and alcohol treatment facility); *Conn. Hosp. v. City of New London*, 129 F. Supp. 2d 123, 135 (D. Conn. 2001) (FHA applies to group homes for alcohol and drug treatment); *Baxter v. Belleville,* 720 F. Supp. 720, 731 (S.D. Ill. 1989) (FHA applies to AIDS hospice); *Oxford House, Inc. v. City of Baton Rouge*, 932 F. Supp. 2d 683, 689 (M.D. La. 2013) (FHA applies to drug rehabilitation facility); *North Shore-Chicago Rehab. Inc. v. Village of Skokie*, 827 F. Supp. 497 (N.D. Ill. 1993) (FHA applies to group home for traumatically brain-injured adults); *Montano v. Bonnie Brae Convalescent Hosp., Inc.*, 79 F. Supp. 3d 1120 (C.D. Cal. 2015) (FHA applies to skilled nursing home facility).

85. The FHA provides that it is illegal "to discriminate against any person in the terms, conditions, privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with such dwelling," because of disability. 42 U.S.C. § 3604(f)(2).

86. Under the FHA, discrimination includes "a refusal to make reasonable accommodations in rules, polices, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

87. Plaintiff requested and was denied the reasonable accommodation of having qualified ASL interpreters, which would have allowed Plaintiff access and an opportunity to participate, use and enjoy services provided by Defendants' facilities that are connected to their dwellings and which equally situated hearing residents are able to enjoy.

88. Defendants discriminated against Plaintiff on the basis of his disability, in violation of the above-cited provisions of the FHA.

89. Plaintiff is an aggrieved person within the meaning of 42 U.S.C. § 3602(i), and has suffered from emotional distress as a result of Defendants' discriminatory conduct.

90. Plaintiff is therefore entitled to nominal damages as a result of Defendants' discriminatory conduct as hereinbefore alleged. 42 U.S.C. § 3604, et. seq.

91. Plaintiff is further entitled to entitled to compensatory damages, punitive damages, and reasonable attorneys' fees and costs pursuant to the FHA. 42 U.S.C. § 3613(c).

**COUNT III: Violations of Chapter 121 of the Texas Human Resources Code**

92. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

93. At all times relevant to this action, the THRC has been in full force and effect and has applied to Defendants' conduct.

94. Chapter 121 of the THRC states that "[t]he policy of the state is to encourage and enable persons with disabilities to participate fully in the social and economic life of the state, to achieve maximum personal independence, to become gainfully employed, and to otherwise fully enjoy and use all public facilities available within the state." Tex. Hum. Res. Code § 121.001.

95. Defendants are "public facilities" within the meaning of Tex. Hum. Res. Code § 121.002(5), as West Oaks is "a retail business, commercial establishment, or office building to which the general public is invited," and because it is a "place of public accommodation . . . to which the general public or any classification of persons from the general public is regularly, normally, or customarily invited."

96. Chapter 121 of the THRC states that "[p]ersons with disabilities have the same

17

rights as persons without disabilities to the full use and enjoyment of any public facility in the state." Tex. Hum. Res. Code § 121.003(a).

97. Chapter 121 of the THRC further states that "[t]he discrimination prohibited by this section includes . . . a failure to . . . (3) provide auxiliary aids and services necessary to allow the full use and enjoyment of the public facility." Tex. Hum. Res. Code § 121.003(d).

98. Defendants discriminated against Plaintiff on the basis of his disability by denying him meaningful access to the services, programs, and benefits Defendants offer to other individuals and by refusing to provide auxiliary aids and services necessary to ensure full use and enjoyment of Defendants' facility in violation of the THRC.

99. Defendants knew or should have known that their actions and/or inactions created an unreasonable risk of causing Mr. Knight greater levels of fear, anxiety, indignity, humiliation, and/or emotional distress than a hearing person would be expected to experience.

100. Plaintiff is entitled to compensatory damages for the injuries and loss he sustained as a result of Defendants' discriminatory conduct and deliberate indifference as alleged under Tex. Hum. Res. Code § 121.003.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Court:

A. Enter a declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have subjected Plaintiff to unlawful discrimination in violation of Section 1557 of the Patient Protection and Affordable Care Act, the Fair Housing Act, and the Texas Human Resources Code;

18

    B.    Issue an injunction forbidding Defendants from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals meaningful access to and full and equal enjoyment of Defendants' facilities, services or programs;

    C.    Issue an injunction ordering Defendants to:

        i.    develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an in-person interpreter for effective communication, when other means are not effective one will be provided as soon as practicable in all services offered by Defendant;

        ii.    develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are deaf and hard of hearing of their right to effective communication; including posting explicit and clearly marked and worded notices that Defendants will provide sign language interpreters upon request to ensure effective communication with deaf or hard of hearing persons;

        iii.    develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing individuals are able to communicate through the most appropriate method under the circumstances, recognizing that the Video Remote Interpreting system is not appropriate in all medical situations;

        iv.    create and maintain a list of sign language interpreters and ensure availability of such interpreters at any time of day or night;

        v.    train all employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the ACA and FHA;

      vi.    train all employees, staff, and other agents on a regular basis about Defendant's policy regarding how to obtain interpreters when reasonably requested by deaf or hard of hearing individuals;

D.    As to all Defendants, award to Plaintiff:

    i.    All compensatory damages available under the relevant statutes;

    ii.    Punitive damages under the FHA;

    iii.    Nominal damages;

    iv.    Reasonable costs and attorneys' fees;

    v.    Interest on all amounts at the highest rates and from the earliest dates allowed by law; and

    vi.    Any and all other relief that this Court deems necessary and appropriate.

Dated: September 24, 2021

Respectfully submitted,

**EISENBERG & BAUM, LLP**

By:_____
Andrew Rozynski (NY #5054465)
24 Union Square East, PH
New York, NY 10003
Main: (212) 353-8700
Fax: (917) 591-2875
arozynski@eandblaw.com
*Attorneys for Plaintiff*